IN THE UNITED STATES DISTRICT COURT

FOR ARIZONA

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Joseph L. McCarthy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  Your affiant, Joseph L. McCarthy, has been employed with U.S. Homeland Security Investigations as a Tactical Officer since June 2007 and attended the Uniformed Police Training Program at the Federal Law Enforcement Training Center in Glynco, GA.  Prior to employment with U.S. H.S.I., I have been employed by U.S. Department of Health & Human Services from 2005 to 2007 as a U.S. GS-0085 Security Guard. From 2004 to 2005 I worked for the Arizona Department of Corrections Arizona State Prison Complex Wilmot as a Corrections Officer II.  I have additional Law Enforcement experience as a Naval Enlisted Code (NEC) 9545 U.S. Naval Law Enforcement Specialist in The United States Department of The Navy both active duty and as a member of the reserves spanning from 1997 to 2014  This includes a combat deployment to Iraq with 1 Marine Expeditionary Force during Operation Iraqi Freedom and multiple Reserve duty tours in the middle east with Naval Security Forces, NSA Bahrain in support of the Operation Enduring freedom , Global War on Terrorism from 2010 through 2014. In addition to my law enforcement and military career, I worked for La Frontera Behavioral Health Services from 1993 through 1997 as a Behavioral Health Specialist II and Counselor II. I also have additional work as a Behavioral Health Technician for Carondelet Behavioral Health from 1995 through 1997. I have a Certification as a Psychiatric Technician and an Associates of Occupational Science degree specializing in Psychiatric Care. I also have an Associates of

Science degree in Administration of Justice from Pima Community College. In addition, I have 80 credit hours of undergraduate studies in Criminal Justice from Northern Arizona University Department of Criminology & Criminal Justice.

2.      From September of 2007 through September of 2015, I was assigned to patrol duties at the Assistant Special Agent in Charge Sells Office/ Homeland Security Investigations. During this time, I interdicted groups of individuals smuggling drugs and contraband on foot, horseback, all-terrain vehicles and in vehicles as a daily part of my duties. I gained field experience in the techniques used by drug trafficking and human smuggling organizations, including tactics used to counter law enforcement operations.

3.      Since October 2015 I have been assigned to the Native American Targeted Investigations of Violent Enterprises Task Force (N.A.T.I.V.E.) which is a High Intensity Drug Trafficking Area (H.I.D.T.A.) initiative.  As a member of this task force. I have conducted and assisted in the interview suspects, who were arrested for drug trafficking offenses. While assigned to this task force I interviewed members of criminal organizations with various roles, such as look out scouts, contraband load drivers, drug and contraband smuggler backpackers, and their facilitators.  As a result, I have gained knowledge on the interworking's of these organizations. I have conducted surveillance on persons suspected of smuggling contraband into the United States in both remote desert and urban areas.

4.      As a member of N.A.T.I.V.E., I have assisted and conducted investigations involving illicit drug activity, and have gathered, structured evidence, and facts pertaining to

administrative and criminal cases. I also have taken statements from material witnesses and suspects. I routinely performed records checks through various law enforcement databases to establish the accuracy of information as well as to gather facts that were relevant to a respective case.

5. During my career as a law enforcement officer, I have continued to receive training on search and seizure, evidence collection, handling informants, gang identification, interviewing techniques, interrogations, and human trafficking. I also received training in surveillance techniques and counter surveillance techniques used by members of criminal organizations. This training has further provided me with knowledge on the tactics, trends, and procedures of drug trafficking organizations, human smuggling organizations and persons associated with these criminal enterprises. I have also taken the knowledge provided in these trainings and applied it throughout various stages of my law enforcement career.

6. Based on my background, training and experience, I know that individuals who are involved in smuggling, harboring, and/or exploiting undocumented immigrants and/or are involved with the trafficking of drugs often do the following:

    a. Use cellular telephones and laptops to arrange, coordinate, and monitor criminal activities including communicating with smugglers, arrangers, and other transporters/drivers. They also use these devices to communicate with these same individuals during counter surveillance activities, to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans.

 b. Use cellular telephones and laptops to contact financial institutions where they launder their proceeds or receive monies for payment for their role in the scheme, individuals who sell/rent real estate, vehicles, or hotel rooms, restaurants or other facilities the smuggler uses during the course of their illegal activities.

 c. Use all the communication technologies available within the cellular telephone and laptop, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed dial, photo and video images, and contact lists containing contact information for their criminal associates to accomplish their criminal activities.

 d. Use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

7. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched:

 a. Cellular phone belonging to Peter James PHILHOWER, Blue Samsung Cell Phone, herein referred to as Target Phone #1.  The device is currently located at the HSI Sells Office Low Risk Evidence Storage Room

9. The applied-for warrant would authorize the forensic examination of this devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

10. On October 10, 2022, Homeland Security Investigations Tactical Officer (TO) Joseph McCarthy of the HSI Assistant Special Agent in Charge (A.S.A.C.) Sells office

responded to the U.S. Customs & Border Protection, Lukeville Port of Entry after receiving a duty call.

11. At approximately 1346 hrs. on October 10, 2022, Peter James PHILHOWER sought entry into the United States at the Lukeville Port of Entry. PHILHOWER was driving a 2008 Dodge Avenger bearing temporary Arizona License Plate ELA7MJ. Jazmin Kassandra GARCIA was the registered owner of the vehicle. During the primary inspection, U.S. Customs & Border Protection Officer (CBPO) Michelle Mercado observed indicators that are indicative of contraband smuggling. The vehicle PHILHOWER was driving was void of any belongings or personalization. The vehicle appeared to have been recently cleaned. The ignition had a single key, which is unusual as most travelers have secondary keys attached. PHILHOWER rolled the window down less than halfway, handing his driver's license through the small gap. He made no eye contact and stared downward and spoke in a very low tone. Based on PHILHOWER's behavior, smuggling trend indicators and the vehicle registration, PHILHOWER was referred to Secondary Inspections.

12. In The secondary inspection U.S. Customs and Enforcement Officer (CEO) Cecilia Ysassi and her assigned Human Detection Narcotic Dog (HDND) Kantor #211119 performed a sniff of the vehicle. HDND Kantor alerted to the passenger and driver side rear tire well areas of the vehicle. In the secondary inspection area, the vehicle was sent through the Z Portal for an X-Ray scan. CBPO Greg Latosynski operated the Z Portal. Latosynski observed anomalies in the rocker panel areas of the vehicle. CBPO officers further inspected the area of interest, and a non-factory pipe was found to run within the body of the vehicle on both the passenger and driver side rocker panel areas. This was the same area the HDND Kantor alerted on as well as the area anomalies were observed by the Z Portal X-Ray operator.

13.     CBPO's further inspected the area of interest in the 2008 Dodge Avenger. As a result of the continued inspection, plastic tube packages were discovered in what appeared to be hidden compartments. These packages contained a crystal-like substance and blue pill tablets. CBPO Teyraen Brown along with CBPO Latosynski tested the crystal-like substance with a GEMINI Spectrum Analyzer 1.9. The test results were positive for methamphetamine. A blue pill tablet was tested with a BTNX Rapid Response Fentanyl Detection Test, which yielded a positive result for Fentanyl. A total of 31.14 kilograms of methamphetamine and 1.18 kilograms of fentanyl were discovered.

14.     PHILHOWER was detained and Homeland Security Investigations was contacted. HSI Tactical Officers Joseph McCarthy, Brian Gobert and Task Force Officer Jose Elias responded to investigate the seizure.

15.     TFO Elias advised PHILHOWER his Miranda Rights in the English language at 1809 hours. PHILHOWER stated he understood his rights and was willing to answer questions without an attorney present. PHILHOWER signed the written Miranda waiver form. TFO Elias conducted the interview. PHILHOWER denied having knowledge of drugs being concealed within the vehicle. He admitted to having physical control over the vehicle for several days. He claimed that he bought the vehicle from his girlfriend who lives in Mexico, he appeared to be unsure of her full name. He planned to drive to Phoenix to get a job with a guy that he has not met. He stated that his girlfriend would tell him via telephone, where this person was and whom he is when he got to Phoenix. PHILHOWER could not articulate any of the places he had been in Mexico or fully identify any of the people he had been in contact with. PHILHOWER stated that he is homeless and unemployed, however he stated that he purchased the 2008 Dodge Avenger for 2,000.00 USD. When asked how he did that if he was homeless and had no income,

he stated it was from his savings. During the interview PHILHOWER's cell phone continuously rang with numbers from Sonoita Mexico, Puerto Penasco Mexico and a number generically from Mexico. In addition, a WhatsApp voice call called multiple times. (WhatsApp is an encrypted messaging and communication application used frequently by Mexican based human and drug smuggling organizations.) The cellphone also made continuous messaging alert noises. PHILHOWER declined consent to search his cellphone.

16. PHILHOWER's nervous presentation and avoidant behaviors at the Lukeville Port of Entry border inspection and his inability to articulate his trip itinerary or details of his time in Mexico are in your Affiant's experience typical of person knowingly involved in drug smuggling. Given that the narcotics were found within body panels of the vehicle, extensive access to the vehicle would be needed to both implant and extract the packages, which also is indicative of the driver being a knowing participant to allow such access.

17. PHILHOWER had sole physical control over the vehicle, which he claimed to have recently purchased, and attempted to drive it into the United States. He received continuous calls on his cellphone from multiple callers from Mexico which is typically seen when contraband loads are interdicted as other members of the smuggling organization are attempting to ascertain the location of their narcotics. Further, given that body paneling would need to be removed, other members of the smuggling organization would need to communicate with PHILHOWER to arrange a meeting point where they could access the vehicle; thus, it makes sense other members of the organization would be contacting him around the time he was expected to have crossed the border. A review of the phone could identify other members the organization, the destination for the drugs secreted in PHILHOWER's vehicle, and what amount of money PHILOWER was expecting to be paid.

18. PHILHOWER identified target phone #1 as being his. PHILHOWER was also asked for consent to search her device, which he did not grant.

## TECHNICAL TERMS

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a

    variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user who is driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits

Case 4:23-mb-01621-BGM   Document 1-1   Filed 03/28/23   Page 10 of 13
23-01621MB

by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal

      computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

  g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

  h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that these devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media

player, GPS navigation device, and PDA.  In my training and experience, the nature of narcotics smuggling, almost universally necessitates frequent and immediate communication between co-conspirators and accomplices.  As such, examining data stored on devices of this type frequently uncover, among other things, evidence that reveals who possessed or used the device; the rank and scope of their participation in the smuggling organization; who their accomplices were; as well as revealing or validating particular details regarding the instant criminal conduct.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

22. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

JOSEPH L MCCARTHY
Digitally signed by JOSEPH L MCCARTHY
Date: 2023.03.28 12:11:21 -07'00'

Joseph L. McCarthy
Tactical Officer
Homeland Security Investigations

Subscribed and sworn to telephonically
this 28th day of March, 2023:

Honorable Bruce G. Macdonald
UNITED STATES MAGISTRATE JUDGE